| |
|---|
| **Ng v Figueroa** |
| 2024 NY Slip Op 32376(U) |
| July 10, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 155023/2018 |
| Judge: James G. Clynes |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| | | |
|---|---|---|
| PRESENT: | **HON. JAMES G. CLYNES** | PART 22M |
| | *Justice* | |

-------------------------------------------------------------------X

TOMMY NG, FANG QIAO ZHU,

                             **Plaintiff**,

               - v -

CARLOS H. FIGUEROA, VECTOR BUILDING CORP.,
FIGUEROA CONSTRUCTION, LLC, DBMG NY, LLC,
DURANTE RENTALS, LLC, and RC RUSSELL, LLC,

                          **Defendant**.

------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 155023/2018 |
| MOTION DATE | 06/03/2021, 01/18/2022, 02/15/2022 |
| MOTION SEQ. NO. | 003 004 005 |

## DECISION + ORDER ON MOTION

The following e-filed documents, listed by NYSCEF document number (Motion 003) 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 89, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 189

were read on this motion to/for           SUMMARY JUDGMENT (AFTER JOINDER)   .

The following e-filed documents, listed by NYSCEF document number (Motion 004) 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 161, 162, 163, 164, 165, 170, 172, 173, 174, 175, 176, 177, 192

were read on this motion to/for                JUDGMENT - SUMMARY        .

The following e-filed documents, listed by NYSCEF document number (Motion 005) 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 159, 160, 166, 167, 168, 169, 171, 179, 180, 181, 182, 183, 184, 185, 186, 190, 191, 193, 195

were read on this motion to/for                JUDGMENT - SUMMARY        .

Upon the foregoing documents and following oral argument, motion sequence numbers 003, 004 and 005 have been consolidated for disposition and are decided as follows.

In motion sequence number 003, defendant DURANTE RENTALS, LLC, (hereinafter "Durante") moves, pursuant to CPLR 3212, for an order granting summary judgment dismissing plaintiffs' second amended complaint and all cross-claims against it. Durante also moves for an order granting summary judgment in its favor on its cross-claims for contractual indemnification as against defendant DBMG NY, LLC (hereinafter "DBMG").

In motion sequence number 004, defendant VECTOR BUILDING CORP., (hereinafter "Vector") moves, pursuant to CPLR 3212, for an order granting summary judgment dismissing plaintiffs' complaint and all cross-claims against it. Durante also moves for an order seeking

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 1 of 26

summary judgment on its claims for contractual indemnification as against defendant DBMG, pursuant to Article 9 of the Trade Contract between Vector and DBMG, including an award of all defense costs incurred to date and into the future.

In motion sequence number 005, defendant RC RUSSELL, LLC, (hereinafter "RC Russell") moves, pursuant to CPLR 3212, for an order granting summary judgment dismissing plaintiffs' complaint and any and all cross-claims against it, and granting summary judgment in its favor on its claims and cross-claims against co-defendants.

## BACKGROUND

Plaintiff commenced this action by filing a summons and verified complaint against defendants CARLOS H. FIGUEROA (hereinafter "Carlos Figueroa") and Vector on May 30, 2018. (*See* NYSCEF DOC. NO. 1).

Defendant Vector joined issue by service of its answer on September 21, 2018. (*See* NYSCEF DOC. NO. 4).

Plaintiff subsequently filed a supplemental summons and verified amended complaint on October 10, 2018, adding defendants FIGUEROA CONSTRUCTION, LLC (hereinafter "Figueroa Construction") and DBMG to the action. (*See* NYSCEF DOC. NO. 13).

In a Court order dated November 19, 2018, a default judgment was entered against defendant Carlos Figueroa. (*See* NYSCEF DOC. NO. 16). To date, Carlos Figueroa has not appeared in this action.[1]

Vector filed its verified answer to plaintiff's verified amended complaint on October 30, 2018. (*See* NYSCEF DOC. NO. 14).

Plaintiff filed a second supplemental summons and verified second amended complaint on November 26, 2018, adding defendants Durante and Russell to the action. (*See* NYSCEF DOC. 18). A stipulation was also executed by plaintiffs and Vector, on November 26, 2018, to add Durante and Russell to the matter. (*See* NYSCEF DOC. NO. 20).

Vector filed its verified answer to plaintiff's verified second amended complaint on December 7, 2018. (*See* NYSCEF DOC. NO. 22).

Defendant Durante joined issue by service of its answer to the verified second amended complaint on January 16, 2019. (*See* NYSCEF DOC. NO. 26).

---

[1] Carlos Figueroa did appear for an EBT on April 8, 2021. (*See* NYSCEF DOC. NO. 129).

**155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.**
**Motion No.  003 004 005**

**Page 2 of 26**

Defendant DBMG joined issue by service of its answer to the verified second amended complaint on March 14, 2019. (*See* NYSCEF DOC. NO. 32).[2]

Defendant Russell joined issue by service of its answer to the verified second amended complaint on May 6, 2019. (*See* NYSCEF DOC. NO. 39).

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff Tommy Ng alleges that on March 26, 2018, as he was a lawful pedestrian at or near 420 East 54th Street, New York, NY, he was struck by a Takeuchi forklift bearing license plate/identification number T3R0700260 operated by Carlos Figueroa. (*See* NYSCEF DOC. NO. 18 at ¶¶ 57-58). Plaintiff alleges that defendants were negligent in their "ownership, operation, maintenance, entrustment and control" of both the vehicle and the construction site located at or about 420 East 54th Street, New York, NY. (*id* at ¶ 59).

## CERTIFIED POLICE ACCIDENT REPORT

The certified police accident report dated March 26, 2018, states in part:

"Driver of Vehicle 1 states he was traveling westbound on East 54 Street in a forklift when Pedestrian 1 ran into the side of his vehicle. Pedestrian 1 states he was walking across the street when Vehicle 1, which was heading the wrong way on a one way street, drove into him knocking him over and running over his left leg causing injuries to his leg and his head. Pedestrian 1 was treated on scene by EMS Albert and transported to Cornell Hospital by Ambulance #08W2. EMS ACR #93689402. Witness 1 states Vehicle 1 was in motion and heading westbound when Pedestrian 1 who was looking away from the vehicle and crossing the street, walked into the side of the vehicle, in between the wheels causing him to get stuck between the wheels and run over. Location is a construction zone and site safety manager states that vehicular traffic was shut down on both sides of street when collision occurred. Site safety manager also states there were safety flag men positioned on the sidewalk. Patrol Supervisor Sergeant DeLouisa on scene. NYSPIN check conducted on Driver 1 and license was confirmed to be valid. No OATH summons issued to Driver 1 for failure to yield because there are no crosswalks or traffic signals at the location. Reporting officer did not witness collision."
(*See* NYSCEF DOC. NO. 131.)

---

[2] DBMG also filed verified answers to the cross-claims of Defendant Durante (*See* NYSCEF DOC. NO. 34) and defendant Vector (*See* NYSCEF DOC. NO. 36) on March 24, 2019. On May 17, 2019, Defendant DBMG filed a verified answer to the cross-claims of defendant Russell. (*See* NYSCEF DOC. NO. 41).

155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 3 of 26

[* 3]

The location of the accident is identified as "420 East 54 Street." "Vehicle 1" refers to the vehicle driven by Carlos Figueroa and is identified as "2013 Takeuchi" bearing license plate number "T3R0700260." The registration is listed as Vector Building Corp., located at 580 Sylvan Avenue, Englewood Cliffs, NJ 07632. "Pedestrian 1" refers to plaintiff, Tommy Ng.[3]

SKID STEER RENTAL CONTRACT

Annexed to Durante's motion for summary judgment is a document labeled "Skid Steer Rental Contract." (*See* NYSCEF DOC. NO. 81). Page two of the document states:

> "DBMG-CONTRACT-23713-D
> 420 E-54TH.ST.
> NEW YORK, NY 10022
> DELIVERING BUCKET ASSET 3435#3525 TO CUST. DBMG
> CONTRAT-23713-D FOR ASSET 3210#0260 TO JOB
> LOCATION 420 EAST 54TH.ST. MANHATTAN C/S-1ST AVE
> CONTACT-JEREMIAH-616-298-4658."
> (*id.* at pg. 2).

Additionally, paragraph 14 of the contract states:

> "14. Lessee agrees to safely use the equipment in accordance with all laws and regulations and assumes all liability and indemnifies and holds the Lessor harmless as to ALL court costs, attorney costs, fines, penalties, tickets, tolls, personal injury, negligence, loss, property damage, accident, product liability claims or any other claims in relation to items leased, sold, repaired or handled by the Lessor. If Lessor incurs or pays any money due to any claims listed above, Lessee will immediately reimburse Lessor for any such cost incurred."
> (*id.* at ¶ 14).

PLAINTIFF TOMMY NG'S TESTIMONY

Plaintiff Tommy Ng testified that his accident occurred on March 26, 2018. (*See* NYSCEF DOC. NO. 78 at pg. 14). Plaintiff testified that his accident occurred directly in front of 420 East 54th Street. (*id.* at 15-16). He testified that he observed construction happening in front of the building of 420 East 54th Street for approximately five (5) years. (*id.* at pg. 16-17). Plaintiff further testified that on the date of the accident, he noticed construction occurring on that street. (*id.* at pg. 20). He observed scaffolding, but no barricades on the sidewalk. (*id.* at 21). Plaintiff observed construction workers in front of the subject building on the day of accident, but testified that no

---

[3] The Police Report does not identify "witness 1" or the site safety manager by name.

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 4 of 26

[* 4]

one told him to not cross the street prior to the accident. (*id.* at pg. 21-22). He also observed pedestrians crossing the street going "east, west, north, south" on the street. (*id.* at pg. 27).

Plaintiff testified that his accident occurred while he was crossing the street in the middle of the block. (*id.* at pg. 28). Plaintiff entered into 420 East 54th Street for approximately five minutes. (*id.* at pg. 72). Five minutes later, he stepped out and began on a 30-foot path, that he described as a barricaded narrow walkway, from the building towards the sidewalk. (*id.* at pg. 73). He observed green scaffolding but could not recall what color the barriers were. (*id.* at pg. 74). He then proceeded to the curb line, stopped for one to two seconds, and then looked to his left. (*id.* at pg. 77). Plaintiff then testified that he entered the roadway. (*id.* at pgs. 77-79). Plaintiff testified that he walked "one or two steps" away from the curb, at which point he came into contact with the forklift. (*id.* at pg. 79).

According to plaintiff, the left side of the forklift struck his lower left leg. (*id.* at pg. 30). He sustained a gash in his head, a bruised right toe and a left leg "open fracture." (*id.* at pg. 32). Plaintiff testified that when the police arrived at the scene, he told them "I was blindside from a forklift that came down the wrong way on a one-way street." (*id.* at pg. 34).

VECTOR TESTIMONY

At a deposition held on January 24, 2020, Thomas Gallione (Gallione) appeared on behalf of defendant Vector. (*See* NYSCEF DOC. NO. 79). *id.* at pg. 8). He testified that he has been employed by Vector for three and a half years. (*id.*). Gallione testified that he knew of the entities Figueroa Construction, DBMG, Durante and RC Russell LLC. (*id.* at pg. 8-11).

He testified that he began with Vector on November 10, 2016 as a senior project manager (*id.* at pg. 12). When asked what his duties and responsibilities were, he stated "I manage projects from start to completion. I build teams of individuals. I assign responsibilities. I deal with the clients and the consultants and the subcontractors." (*id.* at pg. 12). Gallione testified that his clients are private owners of properties or buildings, and Vector is tasked with "making modifications or enhancements or new construction." (*id.* at pg. 12). Since being hired, his job title has not changed. (*id.* at pg. 13).

Gallione testified that Vector became involved with work at 420 East 54th Street in September, 2016. (*id.* at pg. 14-15). Specifically, Vector "had started the renovation of an occupied building to renovate all of the apartments in the entire building from the 2nd floor to the 38th floor." (*id.* at pgs. 15-16). Vector was hired by Slate Property, who Gallione believed was

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 5 of 26

the owner of 420 East 54th Street. (*id.* at pg. 16). Vector was hired as the construction manager and hired contractors to complete the renovations. (*id.*).

According to Gallione, DBMG was "hired to do landscaping at the ground level which included a large outdoor plaza, patios, stairs, precast work, railings, lampposts, site landscaping, in general." (*id.* at pg. 20). DBMG had a physical presence on the job site at 420 East 54th Street. (*id*).

Gallione testified that he had never heard of Durante prior to the week of his deposition (*id.* at pg. 32).

Gallione testified that he had heard of RC Russell because they worked for Vector. (*id.* at pg. 36). He was not sure whether RC Russell was a subcontractor of Vector but testified that it did participate in phase 2 of the project (*id.* at pg. 37-38). RC Russel was tasked with managing the phase 2 scope of work and were comparable to a construction management company. (*id.* at pg. 38).

Gallione testified that he first heard of Figueroa Construction "just this week" and was not aware as to whether it had a role at 420 East 54th Street. (*id.* at pg. 40). When asked if he learned what Figueroa Construction's role was, he testified "I think I was told that Figueroa was a subcontractor to DBMG." (*id.* at pg. 40-41). He did not know what Figueroa was to do as a subcontractor for DBMG. (*id.* at pg. 41).

DBMG TESTIMONY

At a deposition held on July 22, 2020, Kenneth Hall (Hall) appeared on behalf of defendant DBMG. (*See* NYSCEF DOC. NO. 80). Hall testified that he was employed by DBMG. (*id.* at pg. 9). He testified that he has been a partner of DBMG since 2016. (*id.*). He added that DBMG was started in 2016. (*id.* at pg. 10). He described DBMG as a contracting company that does landscape work for various projects, that DBMG was still in existence. (*id.*). DBMG has one other partner named Jeremiah Johnson. (*id.*). Hall testified that he was also a partner of DBMG in March of 2018. (*id.*). DMBG also had no employees in March of 2018. (*id.*). It is based in Indiana and was based there in 2017 and 2018. (*id.* at 26).

Hall testified that he came to learn of an individual named Carlos H. Figueroa through one of the project managers in New York. (*id.* at pg. 16). He also testified that since 2016, DBMG never owned a fork-lift or a skid steer. (*id.* at pg. 18-19).

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 6 of 26

Hall testified that there came a point in time that DBMG was contracted to perform work at or near 420 East 54th Street in Manhattan. (*id.* at pg. 19). It was contracted to install landscape work for that particular building. (*id.* at pg. 22). Hall testified that he recognized the general contractor at this particular job to be Vector. (*id.*). He also believed the owner of the property was a company called Slate but could not recall if it was Slate Construction or Slate Building. (*id.*). Hall personally arrived at the location prior to construction, however, DBMG did not maintain an office at 420 East 54th Street. (*id.*).

After being contracted by Vector, he began providing landscaping services before March 26th of 2018 in the fall of 2017. (*id.* at pg. 25). DMBG was not contracted by any other entity, other than Vector, to perform work at 420 East 54th Street. (*id.* at pgs. 26-27). Hall testified that DBMG was contracted "to provide demolition of the area, the scope areas. Then we were to install precast planters. Then we were to install the plantings themselves. We were to install paver areas." (*id.*). He then testified that DBMG was hired to install benches as well along with some steps and some concrete work. (*id.*). He was not physically present at all at 420 East 54th Street from fall of 2017 until March of 2018, while DBMG was doing its work. (*id.* at pg. 31-32). However, Jeremiah Johnson was there "quite often" meaning that "he was there monthly, a week at a time. After the beginning of 2018, he was there every day, as required by the agreement." (*id.* at pg. 32).

Hall testified that DBMG had a foreman named Greg Matthews (Matthews), who was physically present at 420 East 54th Street three days a week. (*id.* at pg. 34). Matthews served as the foreman for laborers that were brought in that performed exclusively landscaping. (*id.* at pg. 35). He added that Matthews was not an employee of DBMG but was subcontracted. (*id.* at pg. 38).

At the site of 420 East 54th Street, Hall testified that DBMG had a forklift. (*id.* at 35-36). He believed there were two at the site, and the forklifts were rented by DBMG from Durante. (*id.* at 36). Hall testified that while he did not know who operated the forklifts, "it couldn't have been a DBMG employee, but I don't know who did." (*id.* at pg. 39).

Hall testified that he learned about the accident on the same day it occurred. (*id.* at pg. 46). He learned about it from Robert Lopez, a project manager for Vector (*id.* at pg. 41) and Greg Matthews (*id.* at pg. 46). He later learned that defendant Carlos Figueroa was operating one of the rented forklifts and he hit somebody on the street. (*id.* at 48). Hall testified that Carlos [Figueroa]

was neither an employee of DBMG, nor was he subcontracted by DBMG to operate the forklift, at the time of the accident. (*id.* at 53).

According to Hall, Matthews told him that "Carlos [Figueroa] was called by Tim to come in because Tim needed someone to unload pavers, and he called Carlos [Figueroa] to come in and unload the pavers." (*id.* at 56). He testified that Tim was the site manager for Vector. (*id*). Carlos Figueroa was previously working as a general laborer for DBMG prior to this accident. (*id.* at pg. 56-57).

Hall was asked "when DBMG rented the forklift from Durante, did it have someone employed by DBMG at the site that it intended to use as the forklift operator," to which he answered, "that I don't know." (*id.* at pg. 57). He testified that DBMG paid for the forklift when it was rented from Durante. (*id.* at pg. 61). There was no discussion between Hall and Matthews as to who would be allowed to operate the forklift at the site, on behalf of DBMG. (*id.* at pg. 61-62). There was also no discussion between Hall and anyone as to what types of qualifications DBMG would require the forklift operator to have prior to being allowed to operate the vehicle. (*id.* at pg. 62).

Hall testified that he spoke to Matthews as to why Carlos Figueroa was operating DBMG's forklift at the time of the accident, to which Hall added "he said he wasn't sure either because he wasn't working for us." (*id.* at pg. 65).

Hall testified that on March 26, 2018, DBMG was not performing landscaping services at the jobsite. He did not recall the exact date DBMG was told to stop performing work from Vector, but testified that from March 13, 2018 up to March 26, 2018, DBMG did not perform any work at the job site. (*id.*). When DBMG left the job site on March 13, 2018, Hall testified that he did not specifically advise anyone at the site that they were prohibited from using the DBMG forklifts. (*id.* at pg. 68). He did not know if the forklifts on the job site were secured in any type of locked facility nor if the forklifts required a key to be operated. (*id.* at 69).

Hall testified that he knew an operator needed a particular class of license to operate a forklift in March of 2018, but he did not know if Carlos Figueroa possessed this license. (*id.* at pg. 74-75). He also did not know if there was any type of mechanical difficulty or mechanical problem with the forklift that contributed to the accident. (*id.* at pg. 75).

According to Hall, Matthews called Carlos Figueroa after the accident and testified "Tim had called him and needed someone to move pavers off of a truck because it was – it had shown

**155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.**
**Motion No.  003 004 005**

Page 8 of 26

up that day and he called him to help." (*id.* at pg. 77). Hall also testified that DBMG would have to coordinate with representatives from Vector to determine what DBMG was going to do on a given day at the job site. (*id.* at pg. 95).

DURANTE TESTIMONY

At a deposition held on July 29, 2020, Anthony Durante (Durante) appeared on behalf of defendant Durante Rentals. (*See* NYSCEF DOC. NO. 82). Durante testified that he was employed by Durante Rentals as the chief executive officer. (*id.* at pg. 9, 11).

On March 26, 2018, Durante Rentals was in the business of construction equipment rentals, and the company has existed since September of 2009. (*id.* at pg. 10). In March 2018, the president was John Durante, and the chief financial officer ("CFO") was Chris Jones. (*id.* at pg. 12-13). Jason Irwin was the chief operating officer. (*id.* at pg. 13). Durante testified that Durante Rentals was a multistate company in March of 2018, but it was not international and had approximately 115 employees. (*id.* at pg. 14).

Durante testified that prior to March 2018, he entered into an agreement to provide equipment for a job at 420 East 54th Street with DBMG. (*id.* at pg. 14-15). The nature of the agreement was equipment rental, specifically a skid steer loader and forklift attachment. (*id.* At 15). Durante was not certain if, prior to this agreement, Durante had ever rented equipment to DBMG. (*id.* at pg. 17-18). The machine brand was a Takeuchi. (*id.* at pg. 92). However, he testified that Durante had previously rented to Vector several years prior. (*id.* at 18).

Durante described a skid steer loader as a piece of equipment with four wheels and is used to lift items, in addition to having the ability to attach to other tools. (*id.* at pg. 21). When asked for the difference between a skid steer loader and a forklift, he testified that "a skid steer loader traditionally [has] a bucket for moving materials such as dirt and a forklift is dedicated to raising items up and down, similar to a pallet." (*id.*). He later noted that the skid steer is engine operated and is not an electrical device. (*id.* at 38). Specifically, it is a diesel engine. (*id.* at pg. 98). Durante testified that DBMG rented a skid steer with a forklift attachment. (*id.* at pg. 22). He also testified that on March 26, 2018, Durante Rentals was the owner of the skid steer that it rented to DBMG. (*id.* at pg. 29).

Durante was then asked if there were any restrictions that Durante Rentals places on a renter as to how and where they could use the equipment, to which he replied, "there are no restrictions according to New York State law for renting a skid-steerer." (*id.* at pg. 25-26).

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 9 of 26

[* 9]

Durante was then asked the following series of questions:

> Q: Now, was there any type of pre-drop off inspection done by Durante of this piece of equipment before it was dropped off to DBMG?
>
> A: There are three inspections that take place before it's in the customer's hands.
>
> Q: When did those three inspections take place and what did they entail?
>
> A: So, working backwards, the first one would have been a driver inspection, visual inspection when he is removing it from the truck. There is a visual inspection when it's loading on the truck by driver and yard personnel.
>
> Actually, there is four inspections. There is an inspection when it's called out that this piece of equipment will be needed out and somebody goes to pull the piece from the yard, and an inspection before that would be whenever it was last rented from the last rental.
>
> .....
>
> Q: What is inspected to ensure that the item that you are providing to the renter is, in fact, safe, what is done?
>
> A: Unit is operational and void of defects or damage and is up to manufacturer's standards.

(*See* NYSCEF DOC. NO. 82 at pg. 30-31).

Durante testified that a skid steer does not have brakes, because the absence of throttle automatically makes the unit stop. (*id.* at pg. 34). He was then asked "so, failing to put your foot, basically, on the gas pedal will stop it?" to which he answered, "or joysticks, yes." (*id.* at pg. 34-35). Durante later added that a skid steer is controlled by joystick and "let go of the joystick, the machine instantly stops." (*id.* at pg. 35).

Durante further testified that there was no indication from any record that there were any complaints or problems with the skid steer's ability to stop. (*id.* at pg. 42). Durante also never received any complaints from anyone at the site regarding the skid steer. (*id.* at pg. 48).

When asked if there was anything in any agreement where Durante told DBMG that only DBMG could operate the skid steer, Durante testified "yes, it's in our terms and conditions." (*id.* at pg. 43). He also testified that one does not have to have any type of driver's license to operate a skid steer. (*id.*). Durante also described a familiarization process that occurs when the vehicle is dropped off to the renter, which entails a "walk around the unit, show the person how to operate, have the person sit in there and make sure the person is comfortable, answer any questions." (*id.* at pg. 45-46).

155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 10 of 26

[* 10]

10 of 26

Durante was asked why the police report in this incident indicated that the registered owner of the skid steer was Vector Building Corp, to which he answered based on his experience from Durante Rentals over the years "police will fill out a report based on who was in possession, not who has ownership to the machine or title." (*id.* at pg. 58-59).

## RC RUSSELL TESTIMONY

At a deposition held on October 7, 2020, Anthony Buonpastore (Buonpastore) appeared on behalf of defendant RC Russell. (*See* NYSCEF DOC. NO. 84). Buonpastore testified that he was the principal for RC Russell, an LLC. (*id.* at pg. 8). There were no other principals, officers or members besides himself, but there were employees. (*id.*).

Buonpastore testified that in March of 2018, RC Russell had between 5 and 10 employees. (*id.* at pg. 9). RC Russell came into existence in 2009, and it provides management services for "predominantly construction." (*id.*). Buonpastore testified that in March of 2018, he had a project manager assigned to a job at 420 East 54th Street. (*id.* at pg. 14). The project manager was Robert Lopez (*id.*), who had previously served as a project manager approximately 5 times prior to the subject project. (*id.* at pg. 17). As the project manager, Robert Lopez would be on the job site four to five days a week. (*id.* at pg. 18). Buonpastore testified that RC Russell had a trailer or office within the building. (*id.*).

According to Buonpastore, RC Russell was hired by Vector to come onto the property and provide services. (*id.* at pg. 19-20). The project at 420 East 54th Street was a renovation of an existing building. (*id.* at pg. 19). Specifically, "the role was to assist Vector in their endeavors for the construction administration for the phase I and phase II." (*id.* at pg. 20).

Buonpastore was then asked "was [RC Russell] a subcontractor of Vector?" to which he answered, "that's the way I would look at it." (*id.* at pg. 35).

He testified that he was familiar with DBMG as "they were one of the contractors that were on-site." (*id.* at pg. 39). They were responsible for a variety of components for the plaza renovation. (*id.* at pg. 40). Buonpastore testified that DBMG had a physical presence on the job site. (*id.* at pg. 41). He added that DBMG was a subcontractor of Vector. (*id.*).

Buonpastore also testified that Durante Rentals was a company that rented equipment. (*id.* at pg. 43). RC Russell did not rent from Durante, nor was he sure if Vector rented from Durante. However, he believed that DBMG rented from Durante. (*id.* at pg. 43). Buonpastore testified that

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 11 of 26

a skid steer was on the jobsite and was being used in facilitation of the work done by DBMG. (*id.* at 45).

## TIMOTHY NORTON TESTIMONY

At a deposition held on November 9, 2020 Timothy (Tim) Norton appeared for a deposition. (*See* NYSCEF DOC. NO. 85).

Tim Norton testified that on March 26, 2018, he was employed by RC Russell as a superintendent. (*id.* at pg. 5). He had been employed by the company for four years. (*id.*). He testified that he was involved in a project located at East 54th Street as a superintendent. (*id.*). Tim Norton could not recall if anyone else from RC Russell was there on March 26, 2018. (*id.* at pg. 7).

When asked if he had the keys to the skid steer at the site, he testified "not that I remember." (*id.* at pg. 44).

## CARLOS FIGUEROA TESTIMONY

On April 8, 2021, defendant Carlos Figueroa (Figueroa) appeared for a deposition pursuant to a subpoena. (*See* NYSCEF DOC. NO. 86).

He testified that he remembered being involved in an accident on March 26, 2018, at a construction site located on 54th Street. (*id.* at pg. 7). He was working there for one week prior to the incident. (*id.*). When he first started working at East 54th Street, he was working for DBMG. (*id.* at pg. 8).

Carlos Figueroa was then asked the following questions:

> Q: Okay. When you arrived at East 54[th] Street on that day, the day of this accident, was it your understanding that you were working as a DBMG employee at that site or that Vector was hiring you just for that day to work on their skid steer, or what was your understanding as to who you were working for on the day of this accident?
> MR. HEFFERNAN: Note my objection.
> A: That day that I arrived I was working as Carlos and DBMG and Vector had come to an agreement that I would be working there that day.
> Q: Okay. Were you ever paid for that day of work?
> A: I never received pay from them.
> Q: Who was supposed to pay you, what was your understanding as to who was going to be paying you for that day?
> A: Vector was supposed to have paid me for that day, but then Vector had to reimburse DBMG for that day for using my services.

(*See* NYSCEF DOC. NO. 86 at pg. 56).

**155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.**
**Motion No.  003 004 005**

Page 12 of 26

Carlos Figueroa further testified that he was given the skid steer by Tim Norton, who he believed was an employee of Vector. (*id.* at pg. 13-14). He also testified he was being supervised one to two days before the day of the accident by Tim Norton. (*id.* at pg. 14-15). Carlos Figueroa was then asked the following:

> Q: Okay. When you got to the East 54th Street location, what did you do first? Did you have to check in, sign in, speak to somebody, what did you do?
> A: The first thing I did was speak to Tim Norton, he was there waiting for me. He was the one in charge of telling us where to put the pavers.
> Q: Okay. And after you spoke to Tim Norton, what did Tim Norton tell you to do?
> A: He told us that first we had to lower the materials from the truck, we had to prepare the place where we were going to put them. And then he also – he showed us exactly the corner where we were going to put them and there were two men there with flags, they were there to prevent accidents. And then while I was driving the machine, the two men were showing the direction with the flags.
> Q: Okay. Did Tim Norton show you where the skid steer was that morning?
> A: Yes.
> Q: Did he have to give you keys to use the skid steer or did it operate some other way?
> MR: WEINSTEIN: Objection to form.
> A: Yes, he's the one that has the keys. I don't remember exactly that day, but he's the one who knows how to operate that machine.

(*See* NYSCEF DOC. NO. 86 at pg. 20-21).

He later testified that he returned to the site three days after the accident "because Anthony called me and another person and they told me to come because they were going to pay me." (*id.* at pg. 59). Carlos Figueroa later added that "they told me Vector was going to pay me" but he was never paid. (*id.* at pg. 60).

DISCUSSION

It is well settled that "[t]he proponent of a summary judgment motion must make a *prima facie* showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact." (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986] citing *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). Once the movant has made a *prima facie* showing, the burden shifts to the opposing party to "present evidentiary facts in admissible form sufficient to raise a genuine, triable issue of fact." (*Casper v Cushman &*

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 13 of 26

[* 13]

*Wakefield*, 74 AD3d 669, 669 [1st Dept 2010], *lv dismissed* 16 NY3d 766 [2011] [internal quotation marks and citation omitted]).

The court's function on summary judgment is "issue-finding rather than issue-determination." (*Mayo v Santis*, 74 AD3d 470, 471 [1st Dept 2010]). In deciding the motion, "the court should draw all reasonable inferences in favor of the nonmoving party" and deny summary judgment if there is any doubt as to the existence of a material issue of fact (*Assaf v Ropog Cab Corp.*, 153 AD2d 520, 521 [1st Dept 1989] [citations omitted]). "'[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient'" to defeat a motion for summary judgment. (*Siegel v City of New York*, 86 AD3d 452, 455 [1st Dept 2011], quoting *Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]).

Furthermore, since summary judgment is a drastic remedy, it should never be granted when there is any doubt as to the existence of a triable issue of fact. (*Rotuba Extruders v Ceppos*, 46 NY2d 223, 231 [1978]). When the existence is even arguable or debatable, summary judgment should be denied. (*Stone v Goodson*, 8 NY2d 8, 12 [1960]).

## DURANTE'S MOTION FOR SUMMARY JUDGMENT

### A. GRAVES AMENDMENT AND NEGLIGENCE

Defendant Durante first argues that it is entitled to summary judgment dismissing the complaint as a matter of law because plaintiff's claims are barred by 49 U.S.C. 30106 known as the "Graves Amendment." (*See* NYSCEF DOC. NO. 76 at ¶¶ 45-61).

The Graves Amendment bars negligence claims against owners of a leased or rented motor vehicle under a theory of vicarious liability "for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of the rental or lease" provided that the owner can establish "(1) the owner (or an affiliate of the owner) is engaged in the trade or business of renting or leasing motor vehicles; and (2) there is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner)." (49 U.S.C. 30106[a]; *Villa-Capellan v Mendoza*, 135 AD3d 555, 556 [1st Dept 2016]; *see also Jones v Bill*, 10 NY3d 550, 553 [2008]). The Graves Amendment preempts VTL 388, provided that there is no negligence or criminal wrongdoing by the owner of the subject motor vehicle.

**155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.**
**Motion No.  003 004 005**

**Page 14 of 26**

[* 14]

14 of 26

In opposition, plaintiffs argue that Durante's motion for summary judgment should be denied, because the skid steer that caused plaintiff's injuries is not a motor-vehicle under VTL 300, and thus, the Graves Amendment should not apply. (*See* NYSCEF DOC. NO. 103 at ¶ 3). Plaintiffs further argue that VTL 388 "does not prevent vicarious liability for the negligence of an operator under principals of negligent entrustment which the moving defendant [Durante] has failed to address." (*id.* at ¶ 8). Specifically, plaintiffs argue that Durante agreed to rent, and delivered for use, the aforementioned skid steer "without taking any precautions whatsoever to see that this machine would be operated by a reasonably and adequately skilled, reasonably experienced operator, or that it would be operated under safe conditions." (*id.*).

Also in opposition to defendant Durante's motion, defendant RC Russell argues that Durante's summary judgment motion should be denied because "the evidence clearly demonstrates that [Durante] negligently entrusted its skid steer to DBMG after completely failing to exercise even minimal ordinary care to determine DBMG's competency in utilizing the skid steer." (*See* NYSCEF DOC. NO. 92 at pg. 4).

Furthermore, defendant Vector argues that Durante's summary judgment motion should be denied as "being procedurally defective as a result of not including the pleadings of this action and [Durante's] negligent entrustment of the skid steer involved in this subject accident." (*See* NYSCEF DOC. NO. 99 at ¶ 3).

At that outset, the contention that the subject skid steer is not a motor vehicle, as defined in VTL 300, is rejected. Heavy equipment, including a skid steer, may constitute a motor vehicle under VTL 125, for the purposes of the statute, if at the time of the accident, the motor was running, and the operator was moving the machine on a "[p]ublic highway." (*Couture v Miskovitz*, 102 AD3d 723, 723-724 [2d Dept 2013]; *see also Matter of County of Westchester v Winstead*, 231 AD2d 630, 630 [2d Dept 1996]; *see also* VTL 134).

Here, no question of fact exists that plaintiff's accident occurred after he was struck by a skid steer on the roadway adjacent to the premises known as 420 East 54th Street, New York. (*See* NYSCEF DOC. NO. 18 at ¶¶ 57-58; *see also* NYSCEF DOC. NO. 131). Plaintiff specifically testified that as he entered the roadway, he walked "one or two steps" away from the curb, at which point he came into contact with the subject skid steer. (*See* NYSCEF DOC. NO. 78 at pg. 79). Additionally, there is no question of fact that the accident occurred as the vehicle was in motion. (*See* NYSCEF DOC. NO. 86 at pg. 40). The subject skid steer also operates with a diesel engine

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 15 of 26

[* 15]

15 of 26

and is not an electrical device. (*See* NYSCEF DOC. NO. 82 at pgs. 38, 98). Given that the skid steer, which was equipped with a diesel engine, was moving on a public highway as defined by VTL 134, at the time the accident occurred, the skid steer constitutes a motor vehicle for the purposes of this matter.

As VTL 388 does not prevent vicarious liability for negligence under a theory of negligent entrustment, we turn to the question of whether Durante was negligent in its entrustment of the subject skid steer.

The Court of Appeals has held that "[t]he owner or possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use does not create an unreasonable risk of harm to others." (*Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 236 [2001]). To establish a negligent entrustment cause of action, a plaintiff must show that a defendant had "some special knowledge concerning a characteristic or condition peculiar to the [person to whom a particular chattel is given] which renders [that person's] use of the chattel unreasonably dangerous." (*Monette v Trummer*, 105 AD3d 1328, 1330 [4d Dept 2013][internal quotation marks, citations and emphasis omitted]). With respect to a motor vehicle, an owner may be liable if it "had control over the vehicle and if [it] was negligent in entrusting [the vehicle]" to someone who it knew "or in the exercise of ordinary care should have known, was incompetent to operate [the vehicle]." (*Bennett v Geblein*, 71 AD2d 96, 98 [4th Dept 1979]).

Here, it is undisputed that Durante leased a skid steer vehicle directly to DBMG, a contracting company that has been in existence since 2016, to perform landscape work for the project at 420 East 54th Street. (*See* NYSCEF DOC. NO. 80 at pg. 10; *see also* NYSCEF DOC. NO. 81). Durante leased the vehicle with the explicit agreement that only DBMG could operate the skid steer. (*id.* at pg. 43). Anthony Durante also testified that four inspections are performed on any given piece of equipment during the leasing process, and that there were no observed defects or mechanical issues related to this specific skid steer. (*See* NYSCEF DOC. NO. 80 at pgs. 30-31). He further noted that there were no complaints or problems with the skid steer, including the skid steer's ability to stop. (*id.* at 42).

In opposition, Vector argues that Durante negligently entrusted DBMG, a company that Vector itself hired and subcontracted, with the skid steer. Likewise, DBMG, who rented the skid steer from Durante, also argues that Durante was somehow negligent in "ensuring that the equipment was being entrusted to qualified personnel" when the personnel it initially entrusted the

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 16 of 26

skid steer to was DBMG itself. (*See* NYSCEF DOC. NO. 95, at ¶ 16). DBMG also attempts to create a feigned question of fact by arguing that Durante "has failed to establish, *prima facie*, that a representative of DBMG NY signed the 'agreement.'" (*id.* at ¶ 7).

However, DBMG's partner Kenneth Hall, first testified that DBMG rented the skid steer from Durante. (*See* NYSCEF DOC. NO. 80 at pg. 36). He also admitted that the skid steer involved in the accident matched the "numbers" on the rental agreement. (*id.* at pg. 52). Therefore, there is no question of fact that DBMG rented a skid steer from Durante.

Hall further testified that DBMG was told to stop working on the project "around the 13[th] or 14[th] of March, somewhere in the middle of March," approximately two weeks prior to plaintiff's accident. (*See* NYSCEF DOC. NO. 80 at pg. 66). Despite this, Kenneth Hall then testified that he realized that DBMG had left the skid steer on site because "we were going to leave the skid or whatever equipment was there because Vector was going to be taking over the job…we would let them take over or make those payments." (*id.* at pgs. 195-196).

Additionally, we note that Carlos Figueroa, the driver of the skid steer, testified that on the day of the accident, it was his understanding that DBMG and Vector had come to an agreement that he would be working that day. (*See* NYSCEF DOC. NO. 129 at pg. 56). Hall later added that "Carlos [Figueroa] was not working on the site for us at the time of the accident." (*id.* at pg. 48).

Accordingly, no party has raised any question of fact to suggest that that Durante had "some special knowledge concerning a characteristic or condition peculiar" to DBMG, which would have constituted the vehicle's use "unreasonably dangerous." (*Monette v Trummer*, 105 AD3d at 1330 [internal quotation marks, citations and emphasis omitted]).

Firstly, the record is devoid of any information that would demonstrate Durante had any reason to suspect that DBMG would leave the skid steer on-site, at the completion of its project, for Vector to use. At the time DBMG completed its work, it was in control and possession of the skid steer, not Durante. Secondly, no party has established that Durante had any special knowledge that the skid steer would be operated by Carlos Figueroa. Interestingly, a question of fact exists as to who, if anyone, directly and actually employed Carlos Figueroa on the date of the accident.

Accordingly, the parties have not met their burden to raise a triable issue of fact that Durante was negligent in its entrustment of the skid steer and, thus, Durante is entitled to summary judgment on the issue of negligence.

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 17 of 26

## B. FAILURE TO ANNEX PLEADINGS

Lastly, opposing parties' contention that Durante's motion must be denied as procedurally deficient for a failure to annex a copy of the pleadings is rejected. Although CPLR 3212(b) requires that motions for summary judgment be supported by a copy of the pleadings, the court has discretion to overlook the procedural defect of missing pleadings when the record is "sufficiently complete." (*Welch v Hauck*, 18 AD3d 1096, 1098 [3d Dept 2005][internal quotation marks and citation omitted]). The record is sufficiently complete when, although the movant has not attached all of the pleadings to the motion, a complete set of papers is available from the materials submitted. (*Studio A Showroom, LLC v Yoon*, 99 AD3d 632, 632 [1st Dept 2012]).

Here, the pleadings were all filed electronically and were available for the court's consideration. (*Panadian v New York Health & Hosps. Corp.*, 54 AD3d 590, 591 [1st Dept 2008]). Thus, under the circumstances here, the record is sufficiently complete and there is no proof that any of the opposing parties experienced any prejudice by Durante's failure to annex a full and complete copy of the pleadings.

## C. CONTRACTUAL INDEMNIFICATION

Defendant Durante also argues that it is entitled to summary judgment as a matter of law as to the issue of contractual indemnification by DBMG. (*See* NYSCEF DOC. NO. 76 at ¶¶ 62-64). In support, Durante relies on the language of paragraph 14 of the Terms and Conditions of the Skid Steer Contract. (*See* NYSCEF DOC. NO. 81, *supra*).

In opposition, DBMG argues that a question of fact exists as to whether a DBMG representative actually signed the rental agreement between DBMG and Durante. (*See* NYSCEF DOC. NO. 95 at ¶ 7). DBMG attempts to create a question of fact regarding the validity of the rental agreement between DBMG and Durante. This, despite the fact that Kenneth Hall, testifying on behalf of DBMG, stated that DBMG rented a skid steer from Durante and that the skid steer in question matched the one identified in the rental agreement. (*See* NYSCEF DOC. NO. 80).

A party is entitled to full contractual indemnification provided that the intention to indemnify can clearly be implied from the language and purpose of the entire agreement and the surrounding facts and circumstances. (*Drzewinski v Atlantic Scaffold & Ladder Co.*, 70 NY2d 774, 777 [1987]). In order to establish entitlement to full contractual indemnification, "the one seeking indemnity need only establish that it was free from any negligence and was held liable solely by virtue of the statutory liability. Whether or not the proposed indemnitor was negligent

155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 18 of 26

[* 18]

18 of 26

is a non-issue and irrelevant." (*Correia v Professional Data Mgt.*, 259 AD2d 60, 65 [1st Dept 2010]).

Moreover, "a written agreement that it complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). The proper inquiry in determining whether an agreement is ambiguous is whether that agreement is reasonably susceptible to more than one interpretation. (*Chimart Assoc. v Paul*, 66 NY2d 570, 573 [1986]).

Here, the language of the contract states that that DBMG agrees to indemnify "as to ALL court costs, attorney costs…in relation to items leased…or handled by the Lessor." (*See* NYSCEF DOC. NO. 81 at ¶ 14). "Items leased" include the skid steer and its operation. The intention to indemnify here can clearly be implied from both the language and purpose of the agreement. Furthermore, Durante Rentals has met its *prima facie* burden in establishing that it was free from any negligence. Lastly, the agreement between Durante Rentals and DBMG is not reasonably susceptible to more than one interpretation.

## VECTOR'S MOTION FOR SUMMARY JUDGMENT

### A. LEGAL DUTY AND CONTRACTUAL INDEMNIFICATION

Defendant Vector first argues that it is entitled to summary judgment as a matter of law because it owed no duty to the plaintiff, who was a pedestrian on a public roadway. (*See* NYSCEF DOC. NO. 140 at ¶¶ 28-31).

Specifically, Vector argues that it did not own the 2013 Takeuchi skid steer, but rather that Durante was the owner/lessor and DBMG was the lessee. (*id.*). Additionally, Vector argues that it never employed Carlos Figueroa and, thus it "had no legal duty to control [Carlos] Figueroa's operation of the skid steer; and Vector had no duty to plaintiff, a pedestrian using a public roadway." (*id.* at ¶ 30).

Vector next argues that DBMG owes Vector contractual indemnification pursuant to Article 9 of the Trade Contract between Vector as "Construction Manager" and DBMG as "Subcontractor." (*id.* at ¶ 32). Vector maintains that it is entitled to indemnification under Article 9(A)(1) given that the action arises out of "the performance of the [work] by the Subcontractor). (*id.* at ¶ 33). It also argues it is entitled to indemnification under Article 9(A)(2) as the accident

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 19 of 26

"'happen[ed], or is alleged to have happened, in or about the place where such Work is being performed...or while any of the sub-contractor's property, equipment or personnel are in or about such place.'" (*id*). Lastly, Vector alleges indemnification pursuant to Article 9(B)(3) because the action is "'claimed to arise out of or [is] connected with...[t]he use [or] misuse of...any machinery or equipment." (*id.*).

In opposition, plaintiffs argue that Vector has not pled any facts to establish that it could not have taken steps to avoid this accident "by seeing that flag persons were provided, by seeing that barriers and/or signs or warning were provided." (*See* NYSCEF DOC. NO. 170 at ¶ 5). Plaintiff also adds that Vector owed a duty to plaintiff, pursuant to various sections of the Building Code of the City of New York, to exercise "reasonable case to see that the construction site [it] operated was operated in a reasonably safe manner and with obedience to the laws of the City and State of New York." (*See* NYSCEF DOC. NO. 170 at ¶ 6).[4]

Also in opposition, DBMG argues that it had already ceased its work and was not present at the construction site on the date of the accident. (*See* NYSCEF DOC. NO. 164 at pg. 4). Therefore, DBMG argues that based on the plain reading of the contractual agreement between Vector and DBMG, it cannot be held liable for contractual indemnification because "the accident must have arisen out [of] or been related to the proposed indemnitor's performance of work, an accident in a location where the indemnitor was performing work or an accident involving the 'use, misuse, erection, maintenance, operation or failure of any machinery or equipment'." (*id.* at pg. 7). DBMG argues that given that Vector has failed to prove itself free from negligence, that it must therefore follow that Vector's motion seeking "dismissal of DBMG's cross-claims for common law indemnification and contribution" should be denied. (*See* NYSCEF DOC. NO. 164 at pg. 14).

In opposition, RC Russell argues that if Vector's motion for summary judgment is granted, so too should RC Russell's on the grounds that it neither supervised nor controlled Carlos Figueroa, nor did Vector employees have to answer to RC Russell. (*See* NYSCEF DOC. NO. 172 at ¶¶ 3-8). RC Russell adds that "there is no evidence whatsoever to establish that RC Russell was in any way liable or negligent or contributed to plaintiff's alleged accident." (*id.* at ¶ 10). RC Russell also alleges that in the event Vector's motion for indemnification against DBMG is

---

[4] Plaintiff raises identical arguments in its opposition to RC Russell's motion for summary judgment (discussed *infra*).

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 20 of 26

[* 20]

20 of 26

granted, RC Russell should also be afforded contractual indemnification as it would be considered "'anyone else acting for or on behalf of [Vector].'" (*id.* at ¶¶ 13-16).

Having discussed entitlement for contractual indemnification previously (*supra*), here Vector has failed to meet its prima facie burden in establishing that it was free from any negligence. Here, the glaring question of fact remains as to who actually employed Carlos Figueroa on the date of the accident. Vector maintains that it never employed Carlos Figueroa and, thus it "had no legal duty to control [Carlos] Figueroa's operation of the skid steer; and Vector had no duty to plaintiff, a pedestrian using a public roadway." (*See* NYSCEF DOC. NO. 140 at ¶ 30).

Kenneth Hall of DBMG, however, testified that "Carlos [Figueroa] was not working on the site for us at the time of the accident." (*See* NYSCEF DOC. NO. 80 at pg. 48). He also testified that Greg Matthews, a foreman subcontracted by DBMG, told him "Carlos [Figueroa] was called by Tim to come in because Tim needed someone to unload pavers, and he called Carlos [Figueroa] to come in and unload the pavers." (*id.* at pg. 56). Kenneth Hall identified Tim as the site manager and believed his last name was Norton; he also testified that he believed Tim was employed by Vector. (*id.*). However, he also testified that DBMG and Figueroa Construction, LLC, entered into a subcontract on March 19, 2018. (*id.* at pg. 138). Figueroa Construction was "being looked at to do the paver work. (*id.*)." However, when asked "do you know who was supervising the delivery of pavor stones on the accident date" he testified that he understood it to be Tim Norton. (*id.* at 133).

Moreover, during his deposition, Carlos Figueroa himself was asked if he had an understanding as to who he was working for on the date of the accident, to which he replied, "that day I arrived I was working as Carlos and DBMG had come to an agreement that I would be working there that day." (*See* NYSCEF DOC. NO. 86 at pg. 55-56). Carlos Figueroa further testified that he was given the skid steer by Tim Norton, who he believed was an employee of Vector. (*id.* at 13-14). He also testified he was being supervised one to two days before the day of the accident by Tim Norton. (*id.* at 14-15). Carlos Figueroa was then asked the following:

> Q: Okay. When you got to the East 54th Street location, what did you do first? Did you have to check in, sign in, speak to somebody, what did you do?
> A: The first thing I did was speak to Tim Norton, he was there waiting for me. He was the one in charge of telling us where to put the pavers.

155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 21 of 26

Q: Okay. And after you spoke to Tim Norton, what did Tim Norton tell you to do?
A: He told us that first we had to lower the materials from the truck, we had to prepare the place where we were going to put them. And then he also – he showed us exactly the corner where we were going to put them and there were two men there with flags, they were there to prevent accidents. And then while I was driving the machine, the two men were showing the direction with the flags.
Q: Okay. Did Tim Norton show you where the skid steer was that morning?
A: Yes.
Q: Did he have to give you keys to use the skid steer or did it operate some other way?
MR: WEINSTEIN: Objection to form.
A: Yes, he's the one that has the keys. I don't remember exactly that day, but he's the one who knows how to operate that machine.

(*See* NYSCEF DOC. NO. 86 at pg. 20-21).

Tim Norton, however, testified that he was employed by RC Russell on the date of plaintiff's accident. (*See* NYSCEF DOC. NO. 85 at pg. 5). At this juncture, several questions of fact exist.

Firstly, a clear question of fact exists as to who Carlos Figueroa was employed by and by whom he was taking directions from on the date of the accident. Carlos Figueroa understood that he was working for DBMG based on an understanding between Vector and DBMG. (*See* NYSCEF DOC. NO. 86 at pg. 55-56). He also understood that Vector was supposed to have paid him, but then Vector had to reimburse DBMG. (*See* NYSCEF DOC. NO. 86 at pg. 56). DBMG, on the other hand, denies that Carlos Figueroa was working on their behalf on the date of plaintiff's accident. (*See* NYSCEF DOC. NO. 80 at pg. 48). Meanwhile Carlos Figueroa testified he was taking directions from Tim Norton, who was actually an employee of RC Russell. (*See* NYSCEF DOC. NO. 85 at pg. 5). To that end, Vector cannot meet its *prima facie* burden in establishing that it did not owe a duty to plaintiff because the outstanding question of who employed and who directed Carlos Figueroa remains outstanding.

Secondly, a question of fact exists as to whether DBMG, or anyone on their behalf, including Carlos Figueroa, was actually performing work at the subject location that resulted in plaintiff's injury. The conflicting testimony of Kenneth Hall, that DBMG was told to stop working on the project by Vector "around the 13th or 14th of March, somewhere in the middle of March," approximately two weeks prior to plaintiff's accident, raises questions as to whether DBMG was

155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 22 of 26

22 of 26

even on-site on the date of the accident. (*See* NYSCEF DOC. NO. 80 at pg. 66). His testimony that Tim Norton asked Carlos Figueroa to help move pavers on the construction site, on the date of plaintiff's accident, further creates a question of fact as to the employment of Carlos Figueroa. (*id.* at pg. 56). Lastly, the fact that DBMG hadsubcontracted with Figueroa Construction, LLC a few days prior to the accident, further throws confusion into who was ultimately responsible for the undertaking and employment duties of Carlos Figueroa.

Accordingly, Vector has failed to meet its *prima facie* burden establishing its entitlement to summary judgment and thus, Vector's motion is denied in its entirety.

## RC RUSSELL'S MOTION FOR SUMMARY JUDGMENT

### A. RC RUSSELL'S LEGAL DUTY AND CONTRACTUAL INDEMNIFICATION

Defendant RC Russell first argues that it is entitled to summary judgment as a matter of law because it owed no duty to the plaintiff. (*See* NYSCEF DOC. NO. 119 at pg. 5-10).

In relying upon the analysis set forth in *Espinal v Melville Snow Contrs.*, 98 NY2d 136, 140 [2002], RC Russell argues that plaintiff cannot establish that it owed a duty to him on three specific grounds.

Firstly, RC Russell maintains that plaintiff did not launch a force or instrumentation of harm, because it "neither owned, leased nor operated the subject skid steer at the time of the alleged incident." (*See* NYSCEF DOC. NO. 119 at pg.7). Secondly, RC Russell argues that plaintiff did not detrimentally rely on RC Russell's continued performance of duties. (*See* NYSCEF DOC. NO. 119 at pg. 6). Lastly, RC Russell avers that it "did not displace, let alone entirely displace, any contracting party's duty to maintain job site safely." (*id.* at pg. 8-9).

"A contractor may be liable for an affirmative act of negligence which results in the creation of a dangerous condition upon a public street or sidewalk." (*Garafola-Booth v City of New York*, 164 AD3d 473, 473 [2d Dept 2018][internal quotation marks and citation omitted]. Here, RC Russell has failed to eliminate all triable issues of fact as to whether it created the dangerous conditions alleged to have caused the accident.

Despite RC Russell's contention that there is no "evidence that RC Russell supervised, controlled or instructed the manner in which plaintiff performed his work." (*See* NYSCEF DOC.

**155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.**
**Motion No.  003 004 005**

**Page 23 of 26**

23 of 26

NO. 119 at pg. 20), the record establishes that a triable question of fact exists as to who both employed and supervised Carlos Figueroa on the date of the accident (*supra*).

DBMG maintains that it was no longer working at the site on the date of the accident. (*See* NYSCEF DOC. NO. 166 at ¶ 84; *see also* NYSCEF DOC. NO. 80 at pg. 66). Kenneth Hall also testified that Carlos Figueroa was called by Tim Norton to help move pavers on the date of the accident. (*id.* at pg. 56).

Moreover, Carlos Figueroa testified that on the date of the accident, he was taking directions from Tim Norton, (*See* NYSCEF DOC. NO. 129, at pgs. 20-21), who testified that he was an employee of RC Russell at the time the accident occurred. (*See* NYSCEF DOC. NO. 129, at pgs. 20-21). Carlos Figueroa specifically testified that the skid steer's keys were given to him by Tim Norton and he was directed to lower the materials from a truck, and that Tim Norton "showed us exactly the corner where we were going to put them." (*id.*). This testimony directly contradicts RC Russell's contention that there is no "evidence that RC Russell supervised, controlled or instructed the manner in which plaintiff performed his work." (*See* NYSCEF DOC. NO. 119 at pg. 20).

As with the Vector motion (*supra*), several questions of fact exist related to the employment and direction given to Carlos Figueroa. Although he understood that he was working for DBMG based on an understanding between Vector and DBMG, the record is unclear as to who employed him. (*See* NYSCEF DOC. NO. 129 at pg. 55-56), DBMG denies that Carlos Figueroa was working on their behalf on the date of plaintiff's accident. (*See* NYSCEF DOC. NO. 80 at pg. 48). Carlos Figueroa's testimony that he was taking directions from Tim Norton, an employee of RC Russell, further creates a question of fact. Accordingly, RC Russell cannot meet its *prima facie* burden in establishing that it did not control Carlos Figueroa's use of the skid steer, nor that it did not owe a duty to plaintiff.

Based on the foregoing, the portion of RC Russell's motion, seeking to dismiss the loss of consortium claims of plaintiff Fang Qiao Zhu, is also denied.

Additionally, RC Russell's claims that all cross-claims and/or counterclaims interposed by co-defendants should be dismissed against RC Russell, must also be denied as triable questions of fact exist as to whether RC Russell owed a duty to plaintiff. RC Russell's motion seeking indemnification and contribution against co-defendants, "since there is no evidence whatsoever to establish that RC Russell was in any way liable or negligent or contributed to plaintiff's alleged

155023/2018  NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 24 of 26

accident" is also denied. Again, RC Russell has failed to establish that it is free from negligence, with respect to the hiring and directing of Carlos Figueroa.

## B. LABOR LAW CLAIMS

The portion of RC Russell's motion, seeking dismissal of all claims pursuant to Labor Law 241 (6) is granted. The record demonstrates that defendant was not, in any way, employed as part of or affiliated with the ongoing construction at the subject location. As such, plaintiff is not a member of the class of persons intended to be protected by the provisions of Labor Law. (*Morales v 569 Myrtle Ave., LLC*, 17 AD3d 418, 421 [2d Dept 2005]).

Lastly, all labor law claims, insofar as they brought against Vector and DBMG are also dismissed for the foregoing reasons.

## CONCLUSION

Upon the foregoing documents, it is

ORDERED that the part of defendant DURANTE RENTALS, LLC's motion for summary judgment [motion sequence number 003], seeking dismissal, of the second amended complaint of plaintiffs TOMMY NG and FANG QIAO ZHU is granted; and it is further

ORDERED that the part of defendant DURANTE RENTALS, LLC's motion seeking indemnification from DBMG NY, LLC, is granted; and it is further

ORDERED that the summary judgment motion of VECTOR BUILDING CORP. [motion sequence number 004], seeking dismissal of the complaint of plaintiffs TOMMY NG and FANG QIAO ZHU, is denied; and it is further

ORDERED that the part of defendant VECTOR BUILDING CORP.'s motion seeking indemnification from DBMG NY, LLC is denied; and it is further

ORDERED that the summary judgment motion of RC RUSSELL, LLC [motion sequence number 005], seeking dismissal of the complaint of plaintiffs TOMMY NG and FANG QIAO ZHU, is denied, except to the extent that dismissal of all labor law claims of plaintiffs TOMMY NG and FANG QIAO ZHU, is granted; and it is further

ORDERED that all labor law claims of plaintiffs TOMMY NG and FANG QIAO ZHU, as to defendants VECTOR BUILDING CORP. and DBMG NY, LLC, are dismissed; and it is further

155023/2018   NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No.  003 004 005

Page 25 of 26

25 of 26

[* 25]

ORDERED that the part of defendant RC RUSSELL LLC's motion seeking indemnification from co-defendants VECTOR BUILDING CORP., DBMG NY, LLC and DURANTE RENTALS, LLC, is denied; and it is further

ORDERED that counsel for the moving parties shall serve a copy of this order with notice of entry upon the Clerk of the Court and the Clerk of the General Clerk's Office, who are directed to mark the court's records to reflect the change in the caption herein; and it is further

ORDERED that such service upon the Clerk of the Court and the Clerk of the General Clerk's Office shall be made in accordance with the procedures set forth in the *Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases* (accessible at the "E-Filing" page on the court's website)].

ORDERED that the balance of this action is severed and continued.

This constitutes the Decision and Order of the Court.

| 7/10/2024 | | |
|---|---|---|
| DATE | | JAMES G. CLYNES, J.S.C. |

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION |
|---|---|---|
| | ☐ GRANTED ☐ DENIED | ☒ GRANTED IN PART ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT ☐ REFERENCE |

155023/2018 NG, TOMMY vs. FIGUEROA, CARLOS H.
Motion No. 003 004 005

Page 26 of 26

[* 26]